# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| TELXIUS CABLE AMÉRICA S.A., f/k/a TELEFONICA INTERNATIONAL WHOLESALE SERVICES AMÉRICA S.A., | ) ) ) ) |
| Plaintiff, | ) Civil Case No. _____ ) ) JURY TRIAL DEMANDED |
| v. | ) ) ) |
| CHT HOLDINGS, LLC, | ) ) |
| Defendant. | ) ) ) |

## **COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY JUDGMENT**

Plaintiff Telxius Cable América S.A. (f/k/a Telefonica International Wholesale Services América S.A.) ("Telxius"), by and through its undersigned counsel, states the following as its complaint against Defendant CHT Holdings, LLC ("CHT"), based upon CHT's multiple breaches of a December 14, 2017 contract between Telxius and CHT:

## NATURE OF ACTION

1. Submarine fiber-optic cable systems provide most of the world's telecommunications, data, and Internet connectivity. Telxius and its affiliates develop, operate, and sell transmission capacity on those systems to telecommunications carriers, Internet content companies, and other enterprises. CHT is a telecommunications carrier that provides services in the Dominican Republic. Under a contract by and between the parties, CHT agreed to purchase transmission capacity on two of Telxius's submarine cable systems. Subsequently, however, CHT thwarted Telxius's ability to connect its submarine cable to the domestic network in the Dominican Republic. CHT then repudiated its obligation to pay Telxius the contract price for the capacity on the systems. Accordingly, Telxius initiates this action, which (1) seeks a declaratory judgment that CHT's breaches absolve Telxius of further contractual obligations and (2) seeks to recover

damages that CHT caused.

## PARTIES

2.      Plaintiff Telxius Cable America S.A. (f/k/a Telefonica International Wholesale Services América S.A.) ("Telxius") is a corporation organized under the laws of Uruguay with its principal place of business in Av. Luis A. de Herrera 1248, piso 4, Montevideo, Uruguay. Telxius is an affiliate of Telefónica, S.A., a Spanish telecommunications company. Telxius and its affiliates develop, operate, and sell transmission capacity on submarine cable systems to telecommunications carriers, Internet content companies, and other enterprises.

3.      Defendant CHT is a limited liability company organized under the laws of Delaware with its principal place of business in 1820 N Corporate Lakes Blvd, Ste. 101, Weston, Florida, 33326. CHT has two members. One member is an individual who is a resident of Florida and the other is a Delaware corporation with its principal place of business in North Carolina. CHT provides international voice telecommunications services to customers in Puerto Rico and the Dominican Republic, directly and through its affiliates.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the parties are citizens of a State and citizens of a foreign state, and the amount in controversy exceeds $75,000.

5.      This Court has personal jurisdiction because CHT resides and regularly conducts business in the state of Florida. *See* Fla. Stat. §§ 49.193(1)(a)(1) & 49.193(2).

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because CHT resides in Florida, and because CHT and Telxius have agreed to submit to the exclusive jurisdiction of the

United States District Court for the Southern District of Florida and any Florida State Court for the resolution of any disputes arising under the contract that is the subject of this lawsuit.

## BACKGROUND

**A.     Telxius and CHT Enter into the IRU Agreement.**

7.     In 2001, Telxius commenced service on the original configuration of the South America-1 ("SAm-1") submarine cable system, connecting Boca Raton, Florida; San Juan, Puerto Rico; Las Toninas, Argentina; Fortaleza, Salvador, Rio de Janeiro and Santos, Brazil; Arica and Valparaíso, Chile; Puerto Barrios and Puerto San Jose, Guatemala; and Lurin, Peru.  In 2007, Telxius completed construction and commenced service on branches (sometimes referenced as spurs) extending SAm-1 to Barranquilla, Colombia; Punta Carnero, Ecuador; and Mancora, Peru. As part of the branch connecting to Barranquilla, Colombia, Telxius installed a branching unit—a piece of joint-like equipment that allows the future connection of a branch to a new landing—off the coast of the Dominican Republic.

8.     In 2017, Telxius entered discussions regarding a SAm-1 Dominican Republic spur with several different parties, including CHT.  Telxius viewed CHT as an attractive partner for this project, as it was a well-established company that had provided international voice telecommunications services in the Dominican Republic for many years.  As a result, Telxius assumed that CHT was a stable company that understood the Dominican Republic and its commercial environment, geography, and regulators.  Telxius believed that, through this partnership, CHT could supply the contacts and knowledge needed to navigate the local environment, while Telxius could supply its expertise in the deployment and operation of submarine cable systems.  Accordingly, Telxius began exclusive negotiations with CHT, even though other opportunities may have been more profitable for Telxius.

9. On December 14, 2017, Telxius and CHT executed a contract (the "IRU Agreement") that established the terms for the Dominican Republic branch of the SAm-1 system. *See* Exhibit A, attached hereto. Under the IRU Agreement, Telxius would connect the SAm-1 cable system to a cable landing station ("CLS") in Punta Cana, Dominican Republic. CHT, via an indefeasible right of use ("IRU"), for a term of 18 years, would purchase capacity, not only on the SAm-1 system, but also on the BRUSA system, which was a newer system with higher capacity than SAm-1. CHT would gain access to BRUSA through SAm-1, which interconnects with BRUSA in Puerto Rico. *See* IRU Agreement at 5-6 §§ 3.1, 4.

10. Under Section 5.2 the IRU Agreement, CHT agreed to pay a total of $31 million for the IRUs on SAm-1 and BRUSA, according to the following schedule:

    a. An initial payment of $2 million, made preceding execution of the IRU Agreement;

    b. A second payment of $4 million, made within 30 days after execution of the IRU Agreement;

    c. A third payment of $15 million, made within 30 days after Telxius had activated CHT's capacity on both SAm-1 and BRUSA; and

    d. A final payment of $10 million, made within one year after Telxius had activated CHT's capacity on both SAm-1 and BRUSA.

11. The IRU Agreement also provided that each party "submits to the exclusive jurisdiction of the United States District Court for the District of Miami and any Florida State Court for the purposes of all legal proceedings and in accordance with the laws of the State of Florida." IRU Agreement at 18 § 20.2.

### B. Telxius Begins Planning the Project.

12. The project included two components: (1) installation of the submarine cable between the branching unit (installed in 2007) on the SAm-1 system to the CLS in Punta Cana, and (2) connection of the cable to the domestic Dominican network at the CLS. As reflected in the IRU Agreement, the parties "estimated" (but did not guarantee) that all of this work would be completed by the third quarter of 2018. *See* IRU Agreement at 5 §§ 3.1(a), 3.1(b).

13. The CLS is a critical component of any submarine cable system segment, including SAm-1's Dominican Republic branch. The CLS must house, power, and protect electronics necessary for transmitting traffic over the system reliably and without interruption, and the CLS must provide facilities for connection to terrestrial telecommunications networks. The availability of stable electricity, and in the proper amounts, is essential to power and to cool the telecommunications electronics, which generate significant heat. A CLS in a tropical climate such as the Dominican Republic requires significantly more power for air conditioning and more robust insulation for climate control than a comparable facility in a more temperate climate. Although submarine cable operators routinely use batteries and diesel generators to minimize power disruptions and consequent communications disruptions, such arrangements are not a reliable or long-term substitute for reliable electricity from the local grid. A CLS in a hurricane-prone country such as the Dominican Republic must also be constructed to protect against damage from high winds, debris, and flooding. Finally, a CLS must be securely built to protect equipment from unauthorized electronic access and malicious physical damage.

14. The CLS location also affects decisions regarding submarine cable deployment. In particular, a submarine cable operator like Telxius needs to know the location of the CLS so that it can plan the location and connection (which may involve ducts, conduits, easements, and rights

of way) between the CLS and the beach manhole—an underground chamber, like a utility manhole, where the submarine cable is anchored and connects to a land cable that connects onward to the CLS.

15. Under the IRU Agreement, Telxius had sole responsibility for selecting the location of the CLS. *See* IRU Agreement at 6 § 3.2. Nevertheless, recognizing that the parties would need to maintain a healthy commercial relationship for at least 18 years, Telxius solicited and carefully considered CHT's desires for the location of the CLS.

### C. CHT Repeatedly Demands that Telxius Change the Location of the CLS.

16. In 2017, Telxius selected a site in the Cap-Cana area of Punta Cana for the cable landing and CLS. Telxius started the permitting process and submarine cable engineering, including the beach manhole location, based on this location. Under those plans, Telxius was on track to deliver the capacity to CHT by the third quarter of 2018, as the IRU Agreement had estimated.

17. In February 2018, CHT decided to reject the Cap-Cana CLS location. In response, in March 2018, Telxius found an alternative location in the Cabeza de Toro area of Punta Cana. This location was attractive for several reasons. In particular, the beach terrain was well-suited for the process of landing the submarine cable, and there was already a structure—the Hotel Catalonia—that was very close to the beach and had sufficient infrastructure (power, air conditioning, insulation, weather protection, etc.) in place to house the equipment and serve as the CLS.

18. Because of the change in CLS location, Telxius had to redraw its plans for deployment of the submarine cable and construction of the beach manhole. Telxius also modified the permits that were in process. CHT knew that these modifications threatened to delay delivery

past the third quarter of 2018, but CHT nevertheless insisted upon them.

19. In May 2018, CHT rejected the CLS location inside the Hotel Catalonia complex. With this second objection, CHT insisted that the CLS be placed on property—and within a structure—that was owned by CHT or one of its affiliates. CHT explained that it was suspicious of actions that might occur if the CLS was inside a third-party structure. CHT also explained that it had ambitions to construct a large data center that would use the SAm-1 and BRUSA capacity. As a result, it wanted to locate the CLS on a large plot of land on which it could also locate the data center so that the two could be easily connected.

20. CHT chose to locate the CLS on an inland plot that was approximately 8 km away from the Cabeza de Toro beach where the submarine cable was slated to land. Sensitive to the desires of its customer, Telxius agreed to accommodate a third location suitable to CHT.

21. The change, however, required additional modifications to Telxius's plans. Though the cable would still land in Cabeza de Toro, Telxius—at its own expense—would have to construct a much longer terrestrial route to connect the beach manhole to the inland location CHT had chosen. As a result, projected delivery became the second half of 2019. CHT was aware that its decisions were causing these likely delays, but CHT did not mind. Indeed, upon information and belief, CHT did not yet have any commercial operations that could utilize the capacity. Further, delivery would obligate CHT to make its final payments, but CHT was apparently struggling to obtain financing and would have been unable to make the payments at that time.

22. In this respect, CHT requested, and Telxius provided, support in negotiations with CHT's potential investor, who would have provided the funds necessary for CHT to make the payments required by the IRU Agreement. For example, in November 2019, Telxius, at CHT's

invitation, participated in a meeting that was part of the investor's due diligence to assess the financial feasibility of the project. Telxius' management attended and answered all questions raised by the investor and its affiliates. CHT, however, never indicated whether those discussions led to any financing.

### D.  CHT Elects to Receive a $2 Million Discount in Lieu of Interim Capacity.

23. Under the IRU Agreement, Telxius agreed to provide CHT, at no additional charge, with 30 gigabits per second ("Gbps") of "interim capacity." Through this accommodation, the parties contemplated that CHT would obtain temporary access to capacity on another provider's submarine cable system. With this interim capacity, CHT could begin developing commercial operations, and then migrate its telecommunications traffic to SAm-1 and BRUSA once the Dominican Republic branch of SAm-1 was installed, tested, and commissioned.

24. Initially, Telxius had difficulty locating an operator willing to provide the interim capacity. At the time, only two submarine cable operators (América Móvil and C&W Networks) served the Dominican Republic, and each was wary of facilitating the entry of a new competitor like Telxius. Ultimately, in August 2018, Telxius convinced América Móvil to offer CHT 30 Gbps of permanent capacity for ten years, even though the IRU Agreement obliged Telxius to provide interim capacity only until Telxius delivered the SAm-1 and BRUSA capacity under the IRU Agreement. Telxius urged CHT to accept this offer, as it would serve the purpose of the interim capacity, and then would serve as redundant (or back-up) capacity once Telxius activated CHT's capacity on SAm-1 and BRUSA.

25. CHT, however, indicated it did not need or want the capacity offered by América Móvil. Instead, CHT elected to take $2 million—the approximate value of the capacity offered by América Móvil—in place of the interim capacity called for by the IRU Agreement.

### E. The Parties Negotiate an Amendment that CHT Inexplicably Fails to Sign.

26. Subsequently, the parties began negotiating an amendment to the IRU Agreement. The amendment accounted for several different items, most significantly (a) CHT's assumption of responsibility for choosing the CLS location (given that CHT had already vetoed two prior locations), (b) the elimination of Telxius's obligation to provide CHT with interim capacity (given that CHT had declined the interim capacity option with América Móvil as facilitated by Telxius), and (c) the resulting $2 million discount to the total price CHT would pay Telxius under the IRU Agreement.

27. During the remainder of 2018, Telxius negotiated with CHT's counsel at Hunton Andrews Kurth LLP over the terms of the IRU Agreement amendment. By December 2018, the parties had agreed to the terms, and the amendment document was ready for signature. CHT however, surprisingly refused to sign the document. Soon after, CHT's CEO suddenly disappeared, without explanation. Nevertheless, CHT continued to develop the structure for the CLS, and Telxius maintained its intent to discount CHT's ultimate purchase price by $2 million in lieu of providing the interim capacity.

### F. Telxius Deploys the Submarine Cable, but CHT Fails to Deliver the CLS.

28. Through the second half of 2018 and early 2019, Telxius installed the beach manhole at the cable landing site in Cabeza de Toro and deployed and verified continuity of the submarine cable up to the beach manhole location. By September 2019, Telxius had constructed the terrestrial route and extended the submarine cable from the beach manhole to the CLS location chosen by CHT. At that point, Telxius was ready to connect the cable into the CLS and activate the capacity.

29. As noted, CHT agreed to provide the structure for the CLS on land that CHT owned

or was in the process of acquiring. Telxius, however, was supplying and operating the telecommunications equipment to be located in the CLS, and it, therefore, needed to lease the structure from CHT. The parties started negotiating the lease in early April 2019, and on July 26, 2019, Dominican entities related to both CHT and Telxius executed the necessary lease agreement (the "CLS Lease"). Under the CLS Lease, CHT agreed to provide the CLS facilities within thirty days of the lease's effective date, which meant that CHT was obligated to deliver the CLS no later than the end of August 2019.

30. CHT had begun to build the CLS in early 2019. Upon information and belief, however, CHT ceased paying its subcontractor, and the work had virtually ceased by the middle of 2019.

31. As a result of this lack of progress, CHT was nowhere close to delivering the CLS by the August 2019 deadline from the CLS Lease. Telxius repeatedly complained to CHT, and CHT provided assurances that it would resolve the issue. Yet, time continued to pass, and CHT did not deliver the CLS.

32. Beyond the slow pace of construction on the CLS structure, CHT encountered numerous other delays. For example, CHT failed to obtain a "letter of no objection" from the municipality where the CLS was to be located, which prevented the power company, Consorcio Energético Punta Cana Macao, from connecting power to the structure. Only after Telxius's own local attorneys got involved was CHT able to obtain the required letter of no objection. Even then, progress was slow, and CHT was unable to deliver a completed facility to Telxius. Although Telxius performed its contractual obligations and has been ready to complete the cable installation for approximately one year, it has been unable to do so because CHT failed to deliver the CLS. As a result, Telxius's SAm-1 branch and terrestrial extensions have sat unused since they were

constructed, and the useful life of the cables has been shortened, which has reduced the value of the capacity.

### G. CHT Repudiates Its Obligations Under the IRU Agreement.

33. Throughout the course of the project, CHT failed to provide consistent information about its progress toward obtaining the financing necessary to make the payments required by the IRU Agreement. In light of these potential financial issues, Telxius became concerned that, even if it were able to connect its system to a completed CLS, CHT would not be able to make the final $23 million payments it would owe Telxius after delivery of the capacity.

34. Telxius's fears were confirmed on June 30, 2020, when CHT—through lawyers from Morgan, Lewis & Bockius LLP—delivered a letter that complained about the delay in delivering the capacity under the IRU Agreement. The letter did not reference the delays caused by CHT's repeated demands to change the location of the CLS, nor did the letter account for CHT's substantial delays in delivering the CLS. The letter did, however, allege that the "IRU market has shifted dramatically." Based on that allegation, the letter asserted that "any resolution must be premised on the market realities of 2020 and 2021. . . ." In other words, CHT made clear that, even after delivery of the capacity, CHT would not pay the price established by the IRU Agreement.

35. Subsequently, Telxius attempted to resolve the parties' dispute through direct commercial discussions. In those discussions, CHT promised to deliver the CLS by August 19, 2020—which was roughly one year after the deadline provided in the CLS Lease. At the same time, CHT, citing its belief that the market had "shifted," again made clear that it would not pay the IRU Agreement's price once Telxius was able to connect to the CLS and complete delivery of the capacity.

36. CHT did not deliver the CLS on August 19, 2020. Instead, on August 13, 2020, without prior notice to Telxius, CHT filed a complaint in this Court and sought damages based on Telxius's alleged delays in delivering capacity under the IRU Agreement. Based on that action, CHT has demonstrated that it does not intend to follow through on its obligations under the IRU Agreement.

37. On August 24, 2020, Telxius notified CHT that its chronic delays constituted a breach that terminated the lease agreement between the parties.

38. Telxius now seeks a Judgment from this Court declaring that CHT has breached the IRU Agreement and awarding Telxius damages accrued while its investment in the SAm-1 Dominican Republic branch sits unused.

## COUNT ONE
### (Breach of Contract – Prevention of Performance)

39. Telxius incorporates the allegations of paragraphs 1 through 38 as though fully set forth herein.

40. Telxius and CHT entered into the IRU Agreement, pursuant to which CHT impliedly promised not to do anything to hinder or obstruct performance of Telxius.

41. In order to perform its obligations under the IRU Agreement, Telxius needed to have access to a CLS.

42. In May 2018, CHT voluntarily assumed control of the process of locating and delivering the CLS. Telxius reasonably relied on CHT's assurances that CHT would provide a structure that met Telxius's specifications for a CLS.

43. In the July 2019 CLS Lease, CHT committed to delivering the CLS structure by the end of August 2019.

44. By September 2019, Telxius had deployed the submarine cable, constructed the beach manhole, and installed the terrestrial routes needed to connect the cable to the CLS. Thus, Telxius had performed its obligations under the IRU Agreement, and Telxius was ready to complete its performance upon delivery of the CLS. CHT, however, has yet to deliver the CLS.

45. By agreeing to provide the facilities for the CLS, and then failing to do so, CHT breached its obligation not to prevent or hinder Telxius from completing its duties under the IRU Agreement.

46. CHT's prevention of Telxius's performance constitutes a breach of the IRU Agreement.

47. CHT's breach has caused Telxius to suffer damages. Telxius has been unable to recover its costs or generate returns from the substantial investment it has made in constructing the Dominican Republic branch of the SAm-1 system.

## COUNT TWO
### (Breach of Contract – Anticipatory Repudiation)

48. Telxius incorporates the allegations of paragraphs 1 through 47 as though fully set forth herein.

49. Under the IRU Agreement, CHT agreed to pay a total of $31 million for the rights to capacity on the SAm-1 and BRUSA systems. That amount was reduced to $29 million when CHT elected not to receive the interim capacity contemplated by the IRU Agreement.

50. To date, CHT has paid only $6 million to Telxius.

51. Telxius has consistently performed and stood ready to complete its obligations under the IRU Agreement.

52. As discussed above, however, CHT has made a distinct, unequivocal, and absolute declaration that, even after Telxius fully performs under the IRU Agreement, CHT will not honor its obligation to remit the full $29 million payment to Telxius.

53. CHT's repudiation of its payment obligations constitutes a breach of the IRU Agreement.

54. CHT's breach has caused Telxius to suffer damages. Telxius has been unable to recover its costs and generate returns from the substantial investment it has made in constructing the Dominican spur of the SAm-1 system.

## COUNT THREE
### (Declaratory Judgment)

55. Telxius incorporates the allegations of paragraphs 1 through 54 as though fully set forth herein.

56. This is an action for Declaratory Judgment under 28 U.S.C. § 2201.

57. There exists a bona fide, actual, present, practical controversy and dispute between Telxius and CHT regarding whether CHT's failure to deliver the CLS to Telxius and CHT's refusal to pay the amounts provided under the IRU Argument constitute breaches of the IRU Agreement that absolve and relieve Telxius of its continuing obligations thereunder.

58. The foregoing constitutes a justiciable question as to the present rights of the parties under the IRU Agreement.

59. A declaratory judgment is necessary to determine the rights of the parties and resolve the dispute described herein.

## COUNT FOUR
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

60. Telxius incorporates the allegations of paragraphs 1 through 59 as though fully set forth herein.

61. The IRU Agreement incorporates an implied covenant of good faith and fair dealing. Under the implied covenant, CHT must act in manner consistent with the reasonable expectations of the parties, and CHT must not act in a manner that denies Telxius the benefit of the IRU Agreement.

62. CHT breached the covenant of good faith and fair dealing in many ways. These breaches include, but are not limited to, agreeing to provide the CLS facilities and then failing to do so; failing to sign the negotiated amendment; and advising that it would not pay the agreed-upon price under the IRU Agreement.

63. CHT's actions have caused Telxius to suffer damages. Telxius has been unable to collect the full amount owed under the IRU Agreement, and Telxius has been unable to recover its costs and generate returns from the substantial investment it has made in constructing the Dominican spur of the SAm-1 system.

### PRAYER FOR RELIEF

WHEREFORE, Telxius respectfully requests that this Court enter a judgment:

a. Awarding Telxius damages in an amount to be proven at trial;

b. Declaring that CHT has breached the IRU Agreement, thereby absolving and relieving Telxius of any remaining performance obligations; and

c. Awarding interest, costs, and any other relief as this Court deems just and proper.

- 16 -

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Telxius demands trial by jury in this action of all issues so triable.

Dated: August 28, 2020.

        Respectfully submitted,

        DEVINE GOODMAN & RASCO, LLP
        2800 Ponce de Leon Blvd., Suite 1400
        Coral Cables, FL 33134
        Tel.:  305-374-8200
        Email:  grasco@devinegoodman.com
                aandrews@devinegoodmand.com

By: */s Guy A. Rasco*
        Guy A. Rasco, Esq. (F.B.N.: 727520)
        Averil Andrews, Esq. (F.B.N.: 105700)

        And of Counsel

        Kent D. Bressie, Esq.
        Walter E. Anderson, Esq.
        Lauren E. Snyder, Esq.
        Harris, Wiltshire & Grannis, LLP
        1919 M. St. NW, Eighth Floor
        Washington, DC 20036
        (*pro hac vice forthcoming*)

        *Attorneys for Plaintiff*